# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-3430

CSX TRANSPORTATION, INC.,

*Plaintiff-Appellant,*

*v.*

APPALACHIAN RAILCAR SERVICES, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 04-CV-1741—**David F. Hamilton**, *Judge.*

ARGUED FEBRUARY 16, 2007—DECIDED DECEMBER 5, 2007

Before FLAUM, RIPPLE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* In April 2004, for reasons still unknown, thirteen railcars derailed in Evansville, Indiana. CSX Transportation determined that the railcars, which belonged to Appalachian Railcar Services ("ARS"), had derailed on CSX-owned track and, therefore, that CSX was liable for the damage. Some time after paying ARS for the damaged railcars, CSX concluded that the derailment had actually occurred on track that it did not own. Believing that its payment to ARS was based on a mistake, CSX brought this suit to recover the payment. The district court granted summary judgment to ARS based on the voluntary-payment doctrine, which precludes a claim

for restitution on a voluntary payment made with full knowledge of the relevant facts. Because we believe that the voluntary-payment doctrine does not apply to the facts of this case, we vacate and remand for further proceedings.

## I.

In February 2002 ARS agreed to buy 80 railcars from Alliance Coal for $304,000, or $3,800 per car. While the transfer of title was pending, the railcars were stored on a rail spur in Evansville, Indiana. This seven-and-a-half mile spur provides a rail link between track belonging to CSX and a coal power plant owned by the Southern Indiana Gas and Electric Company ("SIGECO"). According to the affidavit of a CSX Roadmaster, the portion of the spur owned by CSX measures only 165 feet. The remainder, on which the eighty railcars were stored, is owned by SIGECO.

On April 1, 2002, local police contacted CSX to report that several cars had derailed near its main line probably as the result of vandalism. That same day, a CSX general foreman investigated the derailment and reported to CSX headquarters a mile marker number on CSX-owned track where he believed that the derailment had occurred. It is not clear from the record, but it is likely that the derailment actually occurred on part of the spur owned by SIGECO at a derailment device meant to prevent runaway cars. CSX contends that the foreman mistakenly reported the location on CSX track because, after derailing, the cars came to rest near CSX's main line.

On the same day that police notified CSX of the derailment and CSX's foreman investigated it, CSX sent thirteen letters—one for each destroyed railcar—to Alliance Coal, which was still the registered owner of the railcars. CSX

took this action pursuant to the rules of the Association of American Railroads ("AAR"), a railroad industry association to which CSX and ARS belong. The letters, which Alliance Coal forwarded to ARS, notified the owner of the railcars that they were destroyed "on CSX line" and asked for a statement of their value. On April 4, 2002, ARS replied with a statement of value for the railcars calculated under AAR rules. On May 2, 2002, CSX sent ARS an authority-to-bill letter and ARS responded with an invoice on May 20. Before paying, CSX informed ARS that, in fact, one of the thirteen cars was not completely destroyed and could be repaired. ARS then submitted a corrected invoice and in July 2002 received CSX's payment of $344,590.20 for twelve destroyed cars, or $28,715.85 per car.[1] In February 2003 CSX paid $9,810.60 to repair the thirteenth car.

Some time later, CSX reviewed the payments it made to ARS and determined that the derailment had actually occurred on the section of the rail spur owned by SIGECO. Under its interpretation of AAR Rule 99, then, CSX believed that it should not have paid for the damage to the cars. In October 2004, thirty months after the derailment, CSX filed this lawsuit to recover the payments it made to ARS. CSX contended that the payments constituted unjust enrichment because they were made on the basis of a mistake of fact. After discovery, both sides moved for summary judgment and the district court granted ARS's motion and denied CSX's motion based on the voluntary-payment doctrine. CSX appeals.

---

[1] It is notable, although not legally significant, that when compared to ARS's purchase price per car, $3,800, this payment represented a substantial windfall. Without more than signing a sale contract, ARS seems to have gained about $300,000.

## II.

On appeal CSX argues that the voluntary-payment doctrine should not bar its claim because the payment was not the result of a negotiation or a compromise regarding an uncertain liability. ARS asks that we affirm based on the voluntary-payment doctrine, but offers alternative grounds on which, it contends, we may also affirm.

We review *de novo* the district court's grant of summary judgment, viewing the facts and all reasonable inferences in the light most favorable to the party opposing judgment, in this case CSX. *Nissan N. Am., Inc. v. Jim M'Lady Oldsmobile, Inc.*, 486 F.3d 989, 994 (7th Cir. 2007).

### A.  The Voluntary-Payment Doctrine

Under Indiana law, which we must apply in this diversity action, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), the voluntary-payment doctrine holds that "money voluntarily paid *in the face of a recognized uncertainty as to the existence or extent of the payor's obligation to the recipient* may not be recovered, on the ground of 'mistake,' merely because the payment is subsequently revealed to have exceeded the true amount of the underlying obligation." *Time Warner Ent. Co. v. Whiteman*, 802 N.E.2d 886, 892 (Ind. 2004) (quoting Restatement (Third) of Restitution & Unjust Enrichment § 6 cmt. e (Tentative Draft No. 1, 2001)) (emphasis in original); *see also Randazzo v. Harris Bank Palatine, N.A.*, 262 F.3d 663, 667-68 (7th Cir. 2001) (discussing the doctrine's application in Illinois). The district court held that the voluntary-payment doctrine barred recovery by CSX because it paid ARS in the face of a recognized uncertainty, the amount of liability owed. As the district court read the record, if there had been certainty as to the amount of liability, CSX would have

simply sent ARS a check rather than asking ARS the value of the damaged railcars.

The district court's argument is somewhat attractive, but ultimately it is flawed; just because one party must ask another for a piece of information does not mean that that information is uncertain. For the voluntary-payment doctrine to apply there must be a recognized uncertainty as to the existence or extent of liability, but read in the light most favorable to CSX, the record suggests that neither party recognized any uncertainty. They both believed that CSX was liable and never disagreed as to the extent of that liability.

The point of the voluntary-payment doctrine is to prevent recovery when a transfer was made pursuant to an agreement of the parties that allocated between them the risk of any later-discovered mistake. Restatement (Third) of Restitution & Unjust Enrichment § 6 cmt. d (Tentative Draft No. 1, 2001). But when the mistake relates to a contingency not contemplated by the parties at the time of the voluntary payment, a claim for restitution exists. *Id.* cmt. e. Thus, "the voluntary-payment rule has no application to the payment of a claim that neither party regards as doubtful." *Id.* What the district court called a "negotiated settlement" between CSX and ARS may have placed upon CSX the risk that ARS set the value of its railcars too high, but it seems unlikely that CSX's payment took into account the possibility that the derailment actually occurred on track that CSX did not own. Since there is no evidence that CSX or ARS regarded CSX's responsibility for the derailment as doubtful, whether the payment embodied the possibility that CSX did not own the track is, at best, a fact question that precludes summary judgment on the basis of the voluntary-payment doctrine.

**B. Unjust Enrichment**

Because it rested its decision on the voluntary-payment doctrine, the district court did not formally consider the merits of additional arguments raised by CSX and ARS. CSX's claim is based on the general rule that "money paid under a mistake of fact, and which the payor was under no legal obligation to make, may be recovered back, notwithstanding a failure to employ the means of knowledge which would disclose a mistake." *Time Warner*, 802 N.E.2d at 890. But the district court did not determine whether CSX actually made its payment under a mistake of fact. ARS contends that CSX cannot prove it was mistaken because the owner of the track where the derailment occurred is still unknown. Furthermore, under ARS's preferred interpretation of the rules governing the railroad industry, CSX would have been under a legal obligation to pay for the damage even if it did occur on track owned by SIGECO. We make no ruling on the merits of CSX's claim or of ARS's defenses, leaving that task for the district court on remand.

We do, however, note the potential merit of one other defense to CSX's claim: ARS may have been unfairly prejudiced by CSX's failure to timely point out its error. By the time CSX brought this suit, the two-year statute of limitations had run on any claim that ARS might have had against SIGECO or any other third party for the destruction of its railcars. The remedy for unjust enrichment on the basis of a mistake is an equitable one and, as such, it is not available when it would be inequitable to the defendant. More specifically, courts have recognized a laches-like exception to the general rule allowing recovery of money paid on the basis of a mistake when the party that received the money by mistake so changed its position that repaying it would be inequitable. *St. Mary's Med. Ctr., Inc. v. United Farm Bureau Family Life Ins. Co.*, 624 N.E.2d 939, 941 (Ind. Ct. App. 1993); *Monroe Fin.*

*Corp. v. DiSilvestro*, 529 N.E.2d 379, 384 (Ind. Ct. App. 1988); Restatement (First) of Restitution § 69 (1937). Simply spending the mistakenly paid money is not enough to preclude restitution. *E.g.*, *Monroe Financial Corp.*, 529 N.E.2d at 385 (mistakenly paid party that used money on home improvement required to repay). But when the receiving party has so changed its position that it cannot be returned to the status quo without being prejudiced, restitution will not be allowed. *E.g.*, *Hullet v. Cadick Milling Co.*, 168 N.E. 610, 611 (Ind. Ct. App. 1929) (mistakenly paid party that used money to pay debts of third party from whom it reasonably believed money mistakenly paid was due not required to repay).

The changed-position exception might bar CSX from recovering its payment to ARS because, as the district court observed, the two-year statute of limitations for injury to personal property had already run by the time CSX filed its complaint.[2] Because ARS reasonably believed that CSX was to blame for the damaged railcars, it took no action to investigate the accident and, quite sensibly, allowed the statute of limitations to run on any

---

[2] CSX disputes this point by contending that the correct limitations period is not Indiana's two-year period for destruction of property, but the six-year period for claims arising out of unwritten contracts. In the alternative, it contends that a discovery rule would apply to toll the statute of limitations until the moment that ARS discovered that CSX did not think itself liable for the damaged railcars. Neither argument is convincing. The first has, as CSX acknowledges, been rejected by an Indiana court of appeals, *French v. Hickman Moving & Storage*, 400 N.E.2d 1384, 1391 (Ind. Ct. App. 1980), and the second ignores that the discovery in discovery rule refers to discovery of the injury and not to the discovery of the source of the injury, *see Wehling v. Citizens Nat'l Bank*, 586 N.E.2d 840, 843 (Ind. 1992).

claim that it might have had against any third party. In other words, ARS may have changed its position in reliance on CSX by losing its right to a remedy against SIGECO or any other third party that might be liable for the damaged railcars. If so, it would be inequitable to now punish ARS for its reliance. But this conclusion only follows if ARS actually had a right to a remedy against SIGECO or another third party. If ARS had no such right then the money paid by CSX was truly a windfall and must be repaid. *See Monroe Fin. Corp.*, 529 N.E.2d at 380 (repayment ordered where stockbroker mistakenly overpaid customer on sale of stock). On the current record, we cannot determine if ARS was entitled to the payment, whether from CSX or some other third party. We also cannot determine whether ARS's reasonable reliance on CSX caused ARS to forego the opportunity to investigate the accident and discover for itself whether it was entitled to payment from CSX or some other third party. We leave those determinations, as well as examinations of the other claims and defenses raised but not decided, to the district court on remand.

## III.

For the reasons stated above, the judgment of the district court is VACATED and the case REMANDED for proceedings consistent with this opinion.

A true Copy:

      Teste:

                         _____

                         *Clerk of the United States Court of*
                         *Appeals for the Seventh Circuit*