NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Plaintiff–Appellee,

v.

Wallace B. WOODHEAD and Lorene M. Woodhead, Defendants–Appellants,

v.

ROTHSCHILD REGISTRY INTERNATIONAL, INC., Seacom Information Associates, Robert B. Ehrlich, Ray Blitstein, Laverne Poppe, and Manufacturers and Traders Trust Company, Third–Party Defendants.

No. 1454, Docket 89–9155.

United States Court of Appeals, Second Circuit.

Argued Aug. 13, 1990.

Decided Oct. 30, 1990.

Eric H. Moss, Great Neck, N.Y., for defendants-appellants.

Richard F. Russell (Joseph Paykin, D'Amato & Lynch, New York City, of counsel), for plaintiff-appellee.

Before MINER and ALTIMARI, Circuit Judges, and KELLEHER, Senior District Judge.*

MINER, Circuit Judge:

Defendants-appellants Wallace B. Woodhead and Lorene M. Woodhead appeal from a summary judgment entered November 15, 1989, in the United States District Court for the Southern District of New York (Stanton, *J.*). The district court awarded plaintiff-appellee National Union Fire Insurance Company ("National Union") reimbursement pursuant to the terms of an indemnity agreement and as subrogee of the holder of a promissory note for money paid on the note plus interest and attorneys' fees. *See National Union Fire Ins. Co. v. Woodhead,* Fed.Sec.L.Rep. (CCH) ¶ 94,455 (S.D.N.Y. May 15, 1989), (1989 WL 53004). The judgment was certi-

fied by the district court as a final judgment pursuant to Federal Rule of Civil Procedure 54(b). A stay of execution on the judgment pending appeal was ordered by this court and was extended at oral argument until disposition of this appeal.

The Woodheads became makers of the promissory note and entered into the indemnity agreement as part of an investment in third-party defendant Seacom Information Associates Limited Partnership ("Seacom"). The note subsequently was negotiated and endorsed to third-party defendant Manufacturers and Traders Trust Company ("M & T"). National Union became subrogated to the rights of M & T when the Woodheads defaulted on the note and, pursuant to the terms of a financial guarantee bond, National Union made the requisite payments in their stead.

On appeal, the Woodheads contend that National Union is not entitled to recover on the note as M & T's subrogee, because it took the note with knowledge that their investment in Seacom had been induced by fraud. The Woodheads also contend that the indemnity agreement was an integral part of the contract to invest in Seacom and that fraud in the inducement of the contract to invest excuses their performance on the related indemnity agreement. For the reasons that follow, we affirm the judgment to the extent it awarded National Union reimbursement on the note as M & T's subrogee, and we vacate the stay of execution on the judgment.

## BACKGROUND

The parties stipulated to the following facts in a consent pretrial order. The Woodheads invested in Seacom, a limited partnership formed under the laws of the State of New York, after their accountant, Laverne Poppe, recommended the investment as a means of reducing their tax liability. Third-party defendant Rothschild Registry International, Inc. ("Rothschild") organized the limited partnership and was its general partner. A Private Placement Memorandum ("PPM") called for investors to make a down payment in cash and to

---

* Of the United States District Court for the Central District of California, sitting by designation.

finance the remainder of their investment by executing and delivering a negotiable promissory note, which by its terms would be governed by New York law, to Seacom. The investors' performance on the note would be guaranteed by a bond issued by an unnamed surety. The limited partnership interests are securities as defined by the Securities Act of 1933 and the Securities Exchange Act of 1934, but were intended to be sold in a private placement for "Accredited Investors" as defined in the Securities and Exchange Commission's Regulation D, 17 C.F.R. § 230.501(a) (1990). Compliance with Regulation D would entitle the limited partnership to an exemption from the registration requirements of section 5 of the Securities Act of 1933, 15 U.S.C. § 77e (1988).

The Woodheads signed a subscription agreement, a credit application, a promissory note and an indemnity agreement, but contend that they never received the PPM. In the subscription agreement, the Woodheads (1) acknowledged that they had reviewed with their advisor the definition of an "Accredited Investor" under Regulation D; (2) represented and warranted that they met the definition of an "Accredited Investor"; and (3) warranted that the financial information submitted with the subscription agreement was "true, correct and complete." They also agreed "immediately to notify [Rothschild] in writing of any substantial change in the[ir] condition or affairs." In the indemnity agreement, the Woodheads granted a security interest in their limited partnership interest to the surety as security for the bond it would post guaranteeing payment of the promissory note. The Woodheads agreed "to protect, indemnify and save the surety harmless from any liability, loss or expenses (including attorneys' fees) sustained or incurred by the surety as a result of the issuance of the bond."

Although the Woodheads signed all of the documents, they did not provide the financial information requested. The documents were left with Poppe with the understanding that he would provide the necessary information and submit completed documents to Seacom and Rothschild.

The Woodheads also gave Poppe their check in the amount of $6,800 payable to Seacom for the cash portion of the purchase price of their limited partnership interest. Poppe subsequently completed the subscription application, indicating that as of December 31, 1983, the Woodheads had a net worth of $1,234,559. He listed their 1981 taxable income as $83,820 and their 1982 taxable income as $79,593. However, the Woodheads' federal income tax return, which Poppe submitted with the documents, indicated that in 1982 the Woodheads reported a gross income of only $14,834 and a taxable income of only $11,519 on gross receipts or sales of $333,268 from their welding business. Poppe submitted his own sworn statement that the Woodheads' 1982 taxable income was low because they had "a bad year and inventory really should have been raised." He indicated that the Woodheads had a gross income of $444,000 and a taxable income of $56,000 in 1983. Poppe sent all of these documents with the $6,800 check to Seacom and Rothschild.

Rothschild delivered the Woodheads' application, indemnity agreement, 1982 federal income tax return, Poppe's sworn statement, and copies of the Woodheads' $6,800 check and promissory note to National Union, the surety, which had reserved the right to approve or disapprove indemnity coverage for each investor in Seacom. National Union issued a financial guarantee bond in favor of Seacom as obligee and Manufacturers and Traders Trust Co. ("M & T") as permitted assignee of the Woodheads' promissory note. The bond obligated National Union to make payment in the event of the Woodheads' default. The Woodheads' note was negotiated and endorsed to M & T, which was not provided with the Woodheads' financial information and had no contact with the Woodheads prior to their investment in Seacom. In return, M & T loaned Seacom an amount equal or nearly equal to the face amount of the note.

The Woodheads paid $35,250 in principal plus interest on the note between January 15, 1984, and July 15, 1985. They have

made no payments on principal or interest on the note since October 15, 1985. Because of the Woodheads' default, National Union paid the balance remaining due on the note in the sum of $28,595.96. Pursuant to the terms of the financial guarantee bond, National Union has been subrogated to the rights of M & T against the Woodheads to the extent of its payments. The note provides that the Woodheads will "pay all costs of collection and enforcement of any amounts due ... including, without limitation, all attorneys' fees and expenses."

National Union commenced this action against the Woodheads for reimbursement of principal, interest and attorneys' fees pursuant to the terms of the indemnity agreement and as subrogee of M & T's note. The Woodheads asserted as affirmative defenses (1) that National Union was not entitled to recover on the note as subrogee because it had taken the note with knowledge that the Woodheads' investment in Seacom had been induced by fraud, and (2) that National Union could not recover as indemnitor because the indemnity agreement was an integral part of the contract to invest, which had been induced by fraud.

The alleged fraud involved other parties whom the Woodheads named as third-party defendants. The Woodheads allege that third-party defendants Poppe, Seacom and Rothschild committed fraud, in violation of, *inter alia,* section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder, by selling to them an "unsuitable" security. They contend that these third-party defendants should have realized from the seemingly contradictory financial information contained in the application and on the tax return that the Woodheads were not "Accredited Investors." Second, the Woodheads allege that Seacom and Rothschild violated section 10(b) and rule 10b–5 by misrepresenting in the PPM that Rothschild would "discount with recourse all of the Subscription Notes for cash." The Woodheads contend that the note was negotiated and endorsed to M & T instead in order to put it in the hands of a holder in due course and deprive them of their defenses.

The district court found that the note was "fully negotiable" and that the PPM did not preclude negotiation to an entity other than Rothschild. It therefore rejected the Woodheads' claims that the identity of the ultimate assignee of their note was misrepresented in the PPM and that the assignment to M & T was fraudulent. The court held that M & T was a holder in due course of the note and that National Union took the note free of the Woodheads' defenses as M & T's transferee. The court also upheld National Union's claim under the indemnity agreement. *National Union,* Fed.Sec.L.Rep. (CCH) ¶ 94,455.

In a separate opinion, the district court found that the issues raised in National Union's claims were entirely distinct from those raised in the Woodheads' claims against the third-party defendants, and that National Union would be harmed by a delay in entering a final judgment. *National Union Fire Ins. Co. v. Woodhead,* No. 86 Civ. 9100 (LLS) (S.D.N.Y. Sept. 27, 1989) (1989 WL 115950 at *2–3, 1989 U.S. Dist. LEXIS 11394 at *3–7). Accordingly, the court, pursuant to Federal Rule of Civil Procedure 54(b), certified the summary judgment in favor of National Union as a final judgment from which the Woodheads could take an immediate appeal. *Id.* (1989 WL 115950 at *3, 1989 U.S. Dist. LEXIS 11394 at *7).

## DISCUSSION

■ A holder in due course takes a negotiable instrument free from the defense of fraud in the inducement. *Chase Manhattan Bank v. Finger Lakes Motors, Inc.,* 102 Misc.2d 48, 52, 423 N.Y.S.2d 128, 130 (Sup.Ct. Ontario Co.1979); *see Bankers Trust Co. v. Litton Sys., Inc.,* 599 F.2d 488, 493 (2d Cir.1979); 80 N.Y.Jur.2d *Negotiable Instruments and Other Commercial Paper* § 300, at 328–29 (1989); N.Y. U.C.C. § 3–305 (McKinney 1964). The transferee of a holder in due course also takes the instrument free from the defense of fraud in the inducement, unless the transferee "has himself been a party to

any fraud or illegality affecting the instrument," or "as a prior holder had notice of a defense or claim against [the instrument]." N.Y. U.C.C. § 3–201(1). The district court found that National Union is entitled to payment on the note because M & T was a holder in due course and that, as M & T's transferee, National Union took the note free from the Woodheads' defense of fraud in the inducement. The Woodheads contend that M & T was not a holder in due course because it took the note in bad faith and without parting with value. They further contend that National Union is not entitled to the rights of a transferee because it had knowledge of, and participated in, fraud in the inducement of the contract to invest in Seacom.

▪ "A holder in due course is a holder who takes the instrument (a) for value; and (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of any defense or claim to it on the part of any person." N.Y. U.C.C. § 3–302. The Woodheads contend that M & T did not give value for the note because National Union's surety bond insulated it from all financial risk. The requirement that value be given is satisfied, however, "to the extent that the agreed consideration has been performed." N.Y. U.C.C. § 3–303. M & T loaned money to Seacom in return for the assignment of the note. Such a loan, even though secured by a financial guarantee bond, constitutes value. *See Modern Indus. Bank v. Hegeman*, 54 N.Y.S.2d 251, 252–53 (Sup.Ct.Spec.T.N.Y.Co.) (where bank credited account and allowed funds to be withdrawn, it gave value for check even though sufficient funds remained in account as security), *aff'd mem.*, 269 A.D. 775, 55 N.Y.S.2d 576 (1st Dep't 1945).

▪ M & T also took the note in good faith and without notice of any defense or claim. Good faith means "honesty in fact in the conduct or transaction concerned." N.Y. U.C.C. § 1–201(19). The Woodheads contend that M & T did not act in good faith because it did not investigate the underlying transaction or their ability to pay. However, M & T was not obligated to make such an investigation absent "actual knowledge of some fact that would prevent a commercially honest individual from taking up the instrument[ ]." *Chemical Bank of Rochester v. Haskell*, 51 N.Y.2d 85, 92, 411 N.E.2d 1339, 1341, 432 N.Y.S.2d 478, 480 (1980). The parties stipulated that M & T had no knowledge of the purported inconsistency between the financial information provided on the Woodheads' subscription application and the financial information reported on their 1982 federal tax return. Absent some knowledge of a fact indicating a claim or defense affecting the note, M & T was not obligated to make any inquiry into the nature of the transaction or the Woodheads' ability to pay. *See Hall v. Bank of Blasdell*, 306 N.Y. 336, 341, 118 N.E.2d 464, 467 (1954) (good faith does not require holder to be "alert for circumstances which possibly might excite the suspicions of wary vigilance"); *Federal Deposit Ins. Co. v. Russo*, 89 A.D.2d 575, 576, 452 N.Y.S.2d 231, 233 (2d Dep't 1982) ("mere suspicion of an infirmity or defect is not notice of a defect and therefore does not constitute bad faith"), *aff'd*, 58 N.Y.2d 929, 447 N.E.2d 81, 460 N.Y.S.2d 532 (1983); *cf. Otten v. Marasco*, 353 F.2d 563, 565–66 (2d Cir.1965) (bad faith where holder knew "bonds did not belong" to transferor and made no inquiry into transferor's authority to negotiate them).

▪ Since M & T was a holder in due course, National Union is entitled to payment on the note as its transferee unless it was "a party to any fraud or illegality affecting the instrument," or "as a prior holder had notice of a defense or claim against [the instrument]." N.Y. U.C.C. § 3–201(1). According to the Woodheads, these issues are governed by our decision in *National Union Fire Ins. Co. v. Turtur*, 892 F.2d 199 (2d Cir.1989), in which we affirmed the denial of summary judgment for National Union as subrogee of a promissory note that was used to finance a similar limited partnership investment organized by Rothschild Reserve International, Inc. In *Turtur*, the investors claimed that Rothschild made a material misrepresentation in the private placement memorandum, in violation of section 10(b) and

rule 10b–5, and the district court found a genuine issue of material fact concerning whether National Union was "a 'party to [a] fraud or illegality affecting the [notes].'" *Id.* at 206 (citations omitted).

The fraud alleged in *Turtur* is not comparable to the fraud alleged in the case at bar. The Woodheads do not contend here that National Union was a party to any material misrepresentation inducing their investment in Seacom. Rather, they contend that the fraud consisted of a failure to investigate the financial information they provided on their subscription application and a failure to disclose that the investment was unsuitable for them. The cases cited by the Woodheads for the proposition that the sale of an unsuitable investment may constitute securities fraud involve defendants who owed a duty to plaintiffs to disclose the suitability of the investment. *See Clark v. John Lamula Investors, Inc.,* 583 F.2d 594, 600 (2d Cir.1978) (broker recommended unsuitable investment to customer); *Rush v. Oppenheimer & Co.,* 592 F.Supp. 1108, 1112 (S.D.N.Y.1984) (same); *cf. Anastasi v. American Petroleum, Inc.,* 579 F.Supp. 273, 275 (D.Colo.1984) (no indemnification against investor who provided false financial information because "[t]he *issuer* has a duty to make a reasonable inquiry into a buyer's background to qualify for the private offering exemption") (emphasis added)). In contrast, National Union's failure to investigate and disclose the suitability of the investment does not amount to fraud because "the element required to make silence fraudulent—a duty to disclose—is absent in this case." *Chiarella v. United States,* 445 U.S. 222, 232, 100 S.Ct. 1108, 1116, 63 L.Ed.2d 348 (1980); *see also Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 12–15 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). As we held in *Turtur,* "[i]t is clear that the [investors], who never dealt directly with National Union, had no contacts or transactions with National Union from which a relationship of trust and confidence could be established. Moreover, in general, a surety does not owe a fiduciary duty to its principal." *Turtur,* 892 F.2d at 207. Since National

Union owed no duty to the Woodheads, its failure to inform them of the alleged unsuitability of the investment in Seacom did not make it "a party to any fraud or illegality affecting the instrument." N.Y. U.C.C. § 3–201(1). National Union, therefore, is not deprived of its status as transferee by reason of its failure to investigate and disclose the alleged unsuitability of the investment for the Woodheads.

■■■ National Union's rights as transferee also are not affected by Seacom's negotiation of the note to M & T or the alleged misrepresentation in the PPM concerning the ultimate holder of the note. First, the district court's finding that the Woodheads knew that their note would be assigned to a possible holder in due course is wholly supported by the record. In the consent pretrial order, the Woodheads stipulated that "the Seacom investors' notes were to be sold, transferred or assigned to an entity unaffiliated with Seacom or Rothschild." A stipulation that is fairly entered into, factually correct and does not constitute a conclusion of law is binding on the parties and the court. *Calvin Klein Ltd. v. Trylon Trucking Corp.,* 892 F.2d 191, 194 (2d Cir.1989). Although the PPM provides that Rothschild would discount the note for cash, the note was "fully negotiable," and nothing in the PPM or any of the other documents prevented Rothschild from assigning the note to a holder in due course. Second, even assuming the PPM contained a material misrepresentation concerning the eventual holder of the note, the Woodheads never saw the PPM. They did not rely on the alleged misrepresentation and cannot establish that it caused them any harm or loss. *See, e.g., Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985); *cf. Competitive Assocs., Inc. v. Laventhol, Krekstein, Horwath & Horwath,* 516 F.2d 811, 814 (2d Cir.1975) (distinguishing between failure to disclose and affirmative misrepresentation cases). National Union therefore was not "a party to any fraud or illegality" by reason of the assignment of the note to M & T and is entitled to the rights of a transferee unless "as a prior holder [it] had

notice of a defense or claim against [the instrument]." N.Y. U.C.C. § 3–201(1).

■ Mere knowledge that the investment was unsuitable for the Woodheads would not defeat National Union's status as a transferee. Knowledge of a claim or defense defeats a transferee's rights only if the transferee had such knowledge as a prior holder of the instrument. *See* N.Y. U.C.C. § 3–201(1) & official comment (3)(a). The shelter principle embodied in section 3–201(1) permits a transferee who was not a prior holder to assert the rights of its transferor even if the transferee knew that the making of the instrument was induced by fraud. *Abraham Lincoln Ins. Co. v. Franklin Sav. & Loan Ass'n*, 434 F.2d 264, 266 (8th Cir.1971); 4 W. Hawkland & L. Lawrence, *Uniform Commercial Code Series* § 3–201:03 (1986); 5 R. Anderson, *Uniform Commercial Code* § 3–201:23 (1984). The purpose behind this shelter principle is to protect the holder in due course "so that he can sell what he has purchased." *Abraham Lincoln Ins. Co.*, 434 F.2d at 266; *see also Rozen v. North Carolina Nat'l Bank*, 588 F.2d 83, 86 (4th Cir.1978); 4 W. Hawkland & L. Lawrence, *supra*, § 3–201:03. The exclusion from the shelter principle of one who was a prior holder with notice of the fraud prevents the prior holder from improving his position "by passing the instrument through clean hands and back into his own hands." 4 W. Hawkland & L. Lawrence, *supra*, § 3–201:03; *see also Rozen*, 588 F.2d at 86.

National Union admittedly is not a typical transferee. Although not a prior holder, it also is not a stranger to the note or the underlying transaction. It has a security interest in the partnership interest purchased with the note and it guaranteed payment on the note; indeed its guarantee in all likelihood ensured that M & T would accept the note. Moreover, assuming without deciding that fraud has been committed by one or more of the third-party defendants, there is a genuine issue concerning National Union's knowledge of fraud by the third-party defendants. Such knowledge would have prevented it from being a holder in due course.

■ However, even assuming that knowledge of fraud prevented National Union from obtaining the status of a holder in due course, it still is entitled to the rights of a transferee because it did "not with such knowledge previously transfer[ ] the instrument." *Gruntal v. United States Fidelity and Guaranty Co.*, 254 N.Y. 468, 473, 173 N.E. 682, 683 (1930). Section 3–201(1) specifically limits the exception to the shelter principle to one who was a *prior holder* with knowledge of the defense. A holder is "a person who is in possession of ... an instrument ... issued or indorsed to him or to his order or to bearer or in blank." N.Y. U.C.C. § 1–201(20) (McKinney Supp.1990). National Union's guaranty of payment on the note and security interest in the underlying investment did not make it a holder, because it was not in possession of the note before acquiring it from M & T.

Depriving National Union of the status of a transferee would require this court to expand on equitable grounds the limited exceptions to the shelter doctrine in section 3–201(1). "Even if we had the power to do so, the equities [the Woodheads] invoked are not the equities the statute regards as predominant." *Langley v. Federal Deposit Ins. Co.*, 484 U.S. 86, 94, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1987) (declining to find exception to FDIC's rights as successor to bank based on FDIC's prior knowledge of bank's misrepresentation). The interests of the makers of negotiable instruments and the interests of holders in due course are carefully balanced within the Uniform Commercial Code. Allowing National Union to assert the rights of M & T as its transferee leaves the Woodheads in the same position as they would be in had M & T itself asserted its rights under the note. *See* 80 N.Y.Jur.2d *Negotiable Instruments and Other Commercial Paper* § 282, at 311 & n. 29 (citing cases). On the other hand, depriving M & T of the ability to transfer the note to National Union "would harm the holder in due course by requiring [it] to retain possession of the instrument." 4 W. Hawkland & L. Lawrence, *supra*, § 3–201:03; *see* 80 N.Y.Jur.2d *Negotiable*

*Instruments and Other Commercial Paper* § 300, at 328 ("courts are adverse to the adoption of rules which would place upon a holder in due course a burden which would unduly hamper the transferability of the negotiable paper").

In the absence of any showing that National Union participated in fraud affecting the instrument or was a prior holder with knowledge of the fraud, we affirm the judgment of the district court to the extent it awarded National Union reimbursement as M & T's subrogee. Having determined that National Union is entitled to reimbursement on the note as M & T's subrogee, there is no need to address its claim under the indemnity agreement.

## CONCLUSION

The judgment of the district court is affirmed to the extent it awarded reimbursement to National Union as M & T's subrogee, and the stay of execution on the judgment is vacated.